1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**

7

**DISTRICT OF ARIZONA**

8

United States of America,

9

Plaintiff,

10

vs.

11

Luis Richard Siqueiros,

12

Defendant.

13
14
15

CR 12-1839-TUC-RCC (JR)

**REPORT AND
RECOMMENDATION**

16

On August 30, 2012, a federal grand jury returned a one-count indictment

17

alleging Defendant Luis Richard Siqueiros was a convicted felon in possession of

18

ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  By Minute Entry

19

order dated September 6, 2012, this matter was referred to Magistrate Judge Rateau

20

for all pretrial matters.  On January 24, 2013, Siqueiros filed a Motion to Suppress

21

(Doc. 22) based on an illegal seizure in violation of the Fourth Amendment.  The

22

Government filed a response (Doc. 27) and Siqueiros filed a reply (Doc. 30).  The

1

Motion was heard by Magistrate Judge Rateau on May 14, 2013. Defendant Siqueiros was present at the hearing and was represented by counsel. The Government presented the testimony of Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Special Agents Creighton Brandt and Lorena Martinez.[1] The witnesses were examined, cross-examined, and questioned by the Court. Having considered the matter, the Magistrate Judge submits the following Findings of Fact and Conclusions of Law and recommends that Defendant Siqueiros's Motion be granted.

## I.    FINDINGS OF FACT

On March 24, 2012, a group of approximately seven ATF agents and fourteen Tucson Police Department officers were working together in a joint operation at the McMahon's Roadrunner Gun Show at the Tucson Community Center ("TCC"). The agents and officers, all dressed in street clothes, were working together in an attempt to identify persons illegally purchasing, possessing, or transferring firearms. They were specifically looking for individuals who might be purchasing guns and ammunition to traffic into Mexico. Included as a target were "straw purchasers" buying weapons on behalf of those who are prohibited from possessing weapons.

---

[1] Both at the beginning and at the conclusion of the hearing, the Government moved for a continuance so that it could present the testimony of ATF Special Agent Frank Occhipinti. Finding that the testimony of Agent Occhipinti had largely been covered by the testimony of Agents Brandt and Martinez, and further noting that the Government received notice of the hearing on April 3, 2013, and nevertheless did not secure the presence of Agent Occhipinti for the hearing, the Court denied the motions to continue.

2

At approximately 4:00 p.m., ATF Agent Frank Occhipinti was stationed in a conference room overlooking the TCC showroom and noticed a male (later determined to be Defendant Siqueiros) and a woman (later identified as Siqueiros's wife, Brandy Siqueiros) at the Burl's Gun Sales vendor table. Agent Occhipinti took notice of the pair because he saw Defendant Siqueiros handle weapons at the table, but saw Ms. Siqueiros get the attention of the vendor and point towards a firearm (later determined to be a Sig Sauer, model 250, .50 caliber pistol). Soon after, Agent Occhipinti observed Ms. Siqueiros completing ATF Form 4473, Firearms Transaction Record Part I – Over-the-Counter. Form 4473 provides information to Federal Firearms Licensees to perform a background check of a potential purchaser through the FBI's National Instant Criminal Background Check System ("NICS").

Upon being told of Agent Occhipinti's suspicions, Agent Brandt went to the Burl's Gun Sales table intending to listen in on the conversation between Siqueiros and his wife. While Agent Brandt was standing at the table, Siqueiros wandered away from the table a few times. Two or three minutes after Brandt's arrival, Ms. Siqueiros sat down in a chair at the table and began completing Form 4473. Shortly thereafter, Siqueiros sat down next to his wife and appeared to be texting on his cellular phone while his wife filled out the required paperwork. *See* Exhibit 1 (photograph showing Siqueiros and his wife seated at the Burl's table with Agent Brandt standing to their left).

Agent Brandt remained standing approximately 5 to 7 feet away from the Siqueiroses for about 10 minutes, but he was unable overhear anything that was said

1   or to determine what or to whom Mr. Siqueiros was texting.  He did see that it was

2   Ms. Siqueiros who paid for the weapon with a red credit or debit card.  Once the

3   purchase was complete, the seller put the gun into a gun box which he placed in a

4   plastic bag that he then handed to Ms. Siqueiros.  After being at the Burl's table for a

5   total of 13 to 15 minutes, Siqueiros and his wife got up from the table and walked

6   behind Agent Brandt, who was still standing at the table.  Not wanting to alert them

7   of his presence, the agent did not immediately follow.

8       Agent Occhipinti moved from the observation room above the showroom

9   floor and went down to the floor.  Approximately five minutes later, Occhipinti

10  informed Brandt that, after they left the Burl's table, Siqueiros and his wife went to a

11  nearby ammunition vendor where Siqueiros made a purchase.  At that point, the

12  agents and TPD officers decided to follow the couple to see if Ms. Siqueiros would

13  transfer the weapon to Siqueiros.  The transfer never happened.  The Siqueiroses then

14  walked to the north exits and went upstairs to the main level of the TCC and

15  proceeded to exit the building to the west.  With approximately six agents and

16  officers following, they proceeded south toward Cushing Street and, after walking a

17  short distance eastward on the north side of Cushing Street, crossed over mid-block

18  to the south side.

19      At that point, TPD Officer Robert Orduno, who was walking with the group of

20  law enforcement officers, held up his badge and said, "Can we talk to you?"  Flanked

21  by two other officers, Agent Brandt then showed his ATF credentials to Siqueiros

22  while Agent Lorena Martinez and TPD Detective Mark Cassel separated Ms.

4

Siqueiros from her husband.  When they made contact with the couple, Siqueiros was holding the plastic bag containing the ammunition and Ms. Siqueiros was still holding the plastic bag containing the Sig Sauer pistol in the gun box. *See* Exhibits 2, 3, and 4 (plastic bags and their contents).

Standing around Siqueiros were Agents Brandt, Occhipinti, and Jim Black, and TPD Officer Orduno.  Also present, but further behind the group, was Agent Paul Brotsko.  Agent Brandt then obtained Siqueiros's identification and read him his *Miranda* rights.  After Siqueiros indicated he understood his rights, Brandt began questioning him, asking him first if he had ever been in trouble with the law. Siqueiros indicated that he had "a long time ago," and the agents ran his background from his identification and found he had a criminal history.

After talking with Siqueiros for five to seven minutes, they seated him on the steps next to the El Minuto Café (Exhibit 5) and then spoke to Ms. Siqueiros for another five to seven minutes.  She also was advised of her *Miranda* rights and was asked if she knew the type of weapon she had purchased.  She did not know the type of gun and, when asked why Siqueiros had purchased the ammunition, stated it was because he knew what type of ammunition it needed.  Agent Brandt then returned to talk to Siqueiros, who when confronted with what Ms. Siqueiros had told the agent, admitted to purchasing the ammunition.

II.     **CONCLUSIONS OF LAW**

   A.     ***Terry* Stop**

   The Fourth Amendment prohibits "unreasonable searches and seizures" by the government.  *Terry v. Ohio*, 392 U.S. 1, 9 (1968).  To justify an investigatory stop under *Terry*, an officer must point to specific and articulable facts which, taken together with rational inferences, reasonably warrant the intrusion.  *Id*.  In making reasonable suspicion determinations, courts must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing.  *United States v. Cortez*, 449 U.S. 411, 417-418 (1981).  This process allows an officer to rely on his own experience and specialized training to make inferences from and deductions about the cumulative information available that "might well elude an untrained person."  *Id*., at 418; *United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000).

   The Government contends that the agents in this case had ample information to justify a *Terry* stop.  It first notes that the agents involved in the surveillance operation were experienced and had conducted surveillance at a number of gun shows.  This experience, along with their training, familiarized the agents with the actions and indicators of a suspected straw purchase and enabled them to identify prohibited possessors.  These indicators include when one individual gives another a quantity of cash to purchase a weapon, when a purchaser transfers a weapon to another, or when one individual purchases the weapon and another purchases the

ammunition.  Against this background of knowledge and experience, the Government

contends that reasonable suspicion was supported by the following behavior:

> Special Agent Occhipinti first observed the defendant and his wife at Burl['s] Gun Sales table.  The defendant and his wife were speaking to each other.  Brandy Siqueiros then asked to see a firearm.  She then began to fill out the ATF Form 4473 paperwork.  At this point the defendant had walked away from her.  He was then observed occasionally walking back over to Brandy Siqueiros and briefly sitting next to her.  The defendant was seen getting up and walking away and then coming back more than once.  Agents Occhipinti and Creighton Brandt saw Brandy Siqueiros leave the Burl's Gun Sales Table with the firearm she purchased in a box in her hand.  She and the defendant then walked over to the Hookn' and Cookn' display table, where the defendant purchased a box of ammunition.  He pain in cash.

*Response to Motion to Suppress*, p. 8.

As a threshold consideration, some of what the Government alleges in the Response was not consistent with the testimony and evidence presented at the hearing.  In the Response, the Government asserts that Siqueiros was walking around and only "occasionally" walking back over and "briefly" sitting next to Ms. Siqueiros.  Agent Brandt's testimony was that Siqueiros sat next to his wife for approximately 10 minutes while she completed the ATF Form 4473.  Also, Agent Martinez testified at the hearing that Agent Occhipinti told her that Siqueiros had handled the weapon while at the Burl's table.  That assertion was not included in the Government's Response.

Despite some uncertainty about what exactly occurred at the Burl's table, even when the facts are construed in favor of the Government and considered in their totality, they do not support a finding of reasonable suspicion.  The Government

1   asserts that Ms. Siqueiros' interaction with her husband while at Burl's and her

2   purchase of the weapon was suspicious.  The evidence indicates that the two were

3   seen talking and looking at weapons at the table, that Siqueiros handled a weapon,

4   and that Ms. Siqueiros then purchased the weapon.  If these activities can be

5   construed as suspicious, they certainly are not particularized.  In many instances

6   couples consult on purchases made by one another.  Certainly husbands, boyfriends

7   and male friends commonly advise their female associates in relation to the purchase

8   of vehicles, lawn mowers, electrical outlets, plumbing supplies, and even guns.

9   Traditionally these purchases were largely made by men.  While society's attitudes

10  have blurred these traditional roles and women regularly make these purchases and,

11  not surprisingly, they often do so with the assistance of someone more

12  knowledgeable who, in many cases, is a man.  Simply put, standing alone, there is

13  nothing suspicious about a man helping a woman with the purchase of a firearm.

14      But, the Government contends, Siqueiros's purchase of the ammunition for the

15  gun makes the situation suspicious enough to support a stop.  There is no dispute that

16  the ammunition Siqueiros purchased was the type needed for the gun Ms. Siqueiros

17  purchased.  Of course there is nothing remarkable about the purchase of ammunition

18  for a gun that was just purchased.  It is not much more remarkable that it was

19  purchased by Siqueiros and not Ms. Siqueiros.  It is notable that the testimony and

20  photograph (Exhibit 1) indicate that Siqueiros sat with his wife while she completed

21  the purchase.  Ms. Siqueiros then paid for the gun with a credit or debit card.  The

22  two then went together to purchase the ammunition.  Presumably the ammunition

1   was much less expensive than the handgun, and thus a cash purchase would be more

2   likely.    Additionally, there was nothing surprising about Siqueiros making the

3   ammunition purchase.   As the Government notes, he had already advised Ms.

4   Siqueiros on the weapon purchase and was likely needed in relation to the

5   ammunition purchase, as well.

6        As noted above, at the outset of the hearing, Agent Brandt identified a few

7   factors that might suggest illegality in relation to a firearms or ammunition purchase.

8   The indicators he identified were when one individual gives another a quantity of

9   cash to purchase a weapon, when a purchaser transfers a weapon to another, or when

10  one individual purchases the weapon and another purchases the ammunition.   Here,

11  Siqueiros did not give Ms. Siqueiros any money.   In fact, Agent Brandt testified that

12  Ms. Siqueiros purchased the gun with what was presumably her own credit or debit

13  card.   There also was no transfer of the weapon from Ms. Siqueiros to her husband.

14  From the time of the purchase until the time officers seized the weapon, it was in Ms.

15  Siqueiros's possession.   Thus, only the third indicator, which is the weakest of the

16  indicators cited by Agent Brandt, that one person bought the weapon and another

17  bought the ammunition, is present in this case.   As discussed above, that factor is

18  readily susceptible to an innocent interpretation.   *See United States v. Santiago-*

19  *Garcia*, 655 F.Supp.2d 1031, 1035-36 (D. Ariz. 2009) (describing behavior in

20  relation to ammunition purchase at gun show and finding no reasonable suspicion).

21  In cases like these, officers cannot rely solely on factors that would apply to many

22  law-abiding citizens.   *See, e.g., United States v. Diaz-Juarez*, 299 F.3d 1138, 1141

1    (9th Cir. 2002); *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1127 (9th Cir.

2    2002).

3        Despite the dearth of indicators, even by the agents' own standards, the

4    Government nevertheless likens this case to *United States v. Parker*, 371 Fed.Appx.

5    749 (9th Cir. 2010). In that decision, the Ninth Circuit found that officers had

6    reasonable suspicion to stop Parker because, *inter alia*, they saw him purchase

7    ammunition and "had reason to suspect that Parker was a felon." *Id.* at 750. In the

8    decision, the court does not explain why the officers had reason to suspect Parker

9    was a felon. Delving into the briefs submitted to the Ninth Circuit in *Parker*

10    discloses that the officers knew of Parker's felon status *before* they stopped him.

11    *Brief of Appellee United States*, 2009 WL 5836074 (Sept. 4, 2009). If that were the

12    case here, and the agents knew that Siqueiros was a convicted felon before they

13    stopped him, the Court would not hesitate to find reasonable suspicion or even

14    probable cause. However, unlike the officers in *Parker,* the agents and officers here

15    did not have any information about Siqueiros's criminal background prior to stopping

16    him. Thus, this case is not like *Parker*. Looking at the totality of the circumstances,

17    the Court finds that the officers and agents, in making the stop of Siqueiros, had no

18    more than a hunch and the stop was not supported by reasonable suspicion.

19    **III.  RECOMMENDATION**

20        Based on the foregoing, the Magistrate Judge **RECOMMENDS** that the

21    District Court, after its independent review, **grant** Defendant Siqueiros's Motion to

22    Suppress (Doc. 22).

1    This Recommendation is not an order that is immediately appealable to the

2    Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1),

3    Federal Rules of Appellate Procedure, should not be filed until entry of the District

4    Court's judgment.

5    However, the parties shall have fourteen (14) days from the date of service of

6    a copy of this recommendation within which to file specific written objections with

7    the District Court.  *See* 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the

8    Federal Rules of Civil Procedure.  Thereafter, the parties have fourteen (14) days

9    within which to file a response to the objections.  If any objections are filed, this

10   action should be designated case number: **CR 12-1839-TUC-RCC**.  Failure to timely

11   file objections to any factual or legal determination of the Magistrate Judge may be

12   considered a waiver of a party's right to *de novo* consideration of the issues.  *See*

13   *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir.2003)(*en banc*).

14   Dated this 17th day of May, 2013.

15

16

17   _____

18   Jacqueline M. Rateau
     United States Magistrate Judge

19

20

21

22

11